# ASSET PURCHASE AGREEMENT

**By and Among**

**MOUNTAIN RUN, LLC**

**and**

**MOUNTAIN RUN GOLF, INC.**
**("_Sellers_")**

**and**

**MRAP, LLC**
**("_Buyer_")**

**April ___, 2010**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the *"Agreement"*) is entered into as of April __, 2010, (the *"Effective Date"*) by and among MOUNTAIN RUN, LLC, a Virginia limited liability company (*"MR"*), MOUNTAIN RUN GOLF, INC., a Virginia corporation (*"MR Golf"* and, together with MR, "Sellers"), and MRAP LLC, a Virginia limited liability company or its designee *("Buyer")*. Buyer and Sellers are referred to herein individually as a *"Party,"* and collectively as the *"Parties."*

## RECITALS

A.      Sellers are presently debtors-in-possession in the bankruptcy proceedings initially filed on October 27, 2009 under Chapter 11, Title 11 of the United States Code (11 U.S.C. §§ 101, *et. seq*.) and presently pending in the United States Bankruptcy Court for the Eastern District of Virginia (Case No. 09-37000 (MR Golf) and Case No. 09-37005). The bankruptcy proceedings of both MR Golf and MR were procedurally consolidated into Case No. 09-37000.

B.      Sellers are engaged in the business of owning and operating the golf course and related facilities and business operations known as "The Federal Club" as well as developing residential real estate properties located proximate to The Federal Club (the *"Business"*).

C.      Pursuant to Section 363(3) of the Bankruptcy Code, after notice and a hearing, Sellers may sell, use, or lease property of Sellers' Bankruptcy Estate outside the ordinary course of business.

D.      Buyer desires to purchase substantially all of the assets, properties and rights of Sellers, and Sellers desire to sell such assets, properties and rights to Buyer, and Buyer desires to assume certain liabilities of Sellers, and Sellers desire to assign such liabilities to Buyer, all on the terms and subject to the conditions set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, subject to approval by the United States Bankruptcy Court, the Parties hereto agree as follows:

**Section 1.      Certain Definitions.**  As used in this Agreement, capitalized terms not otherwise defined shall have the respective meanings ascribed to them in **Appendix A** to this Agreement.

**Section 2.      Basic Transaction.**

(a)      Purchase and Sale of Assets.  Buyer agrees to purchase from Sellers, and Sellers agree to sell, transfer, convey and deliver to Buyer, at the Closing, free and clear of all liens, encumbrances, mortgages, pledges, charges or other Security Interests, all of the Acquired Assets

for the consideration specified below in this Section 2. "*Acquired Assets*" means, except for the Excluded Assets and as otherwise set forth in the Agreement, all right, title, and interest in and to all of the assets and properties of Sellers owned, used or held for use by Sellers primarily in connection with the Business, whether tangible or intangible, whether real, personal or mixed, whether fixed, contingent or otherwise, and wherever located, including, without limitation, the following:

   i.     all real estate (more particularly described on Exhibit A hereto) and improvements, owned by Sellers, subject to any obligations of the Sellers regarding land provided to the Mountain Run Home Owners Association, including, without limitation: (i) land on which The Federal Club golf course is located; (ii) unsold lots located in Sections 4 and 5 of Mountain Run consisting of six developed lots and 19 undeveloped lots, but excluding Lot 40; and (iii) subject to the provisions of Section 6(e), land on which 11 additional lots are intended to be platted and recorded (the "*Meg's Lane Lots*"); (iv) pool facilities and pool house, including the land on which they are located, and (v) the land which is reserved for construction of an additional 9 holes to be added to the golf course (collectively, the "*Real Property*");

   ii.    all of Sellers' right, title and interest in and to all agreements and contracts assigned to Buyer pursuant to this Agreement, along with any accounts receivable associated therewith leases, lot sales contracts (except for the contract for the sale of Lot 40), declarant's rights under restrictive covenants, any rights to appoint officers and directors of the Mountain Run Owners Association, indentures, mortgages, instruments, Security Interests in favor of Sellers, guaranties in favor of Sellers and other similar arrangements, and all rights thereunder (collectively, the *"Assumed Contracts")*, provided that any cure cost or any other liabilities or obligations arising out of a breach of any Assumed Contract prior to the date hereof or by reason of the assignment provided for herein will be the sole obligation and responsibility of the Buyers;

   iii.   all of Sellers' rights, title and interest in and to all assignable approvals, permits, licenses, orders, registrations, certificates, variances, exemptions, and similar rights obtained from Governmental Entities, to the extent transferable;

   iv.    all notes receivable relating to the Business coming due after Closing, including, but not limited to, all billed and unbilled accounts receivable, membership deposits and initiation fees and any promissory notes or other instruments evidencing membership deposits and initiation fees not yet paid;

   v.     all personal property, tangible and intangible, owned and/or leased to the extent assignable, including, without limitation, any intercompany loans, golf course maintenance equipment, irrigation system and related equipment, golf carts, either Seller's interest, if any, in the pool furniture and pool maintenance equipment, tents, furniture, point-of-sale computers, and all landscaping, horticultural and construction materials and supplies (mulch, sand, seed, gravel, shrubs, etc.);

   vi.    all of Sellers other leases, subleases, and rights thereunder, including, without limitation the ground lease of the golf course property between MR and MR Golf, as set forth on **Schedule 1** and noted as "to be assumed";

2

vii.     copies of all books, records, ledgers, stock transfer books, files, any other documents relating to the organization, maintenance, and existence of MR as a limited liability company and MR Golf as a corporation, correspondence, lists, plats, architectural plans, drawings, specifications, creative materials, advertising and promotional materials, customer lists, studies, reports, and other printed, written or machine-readable materials to the extent in the Sellers' possession;

viii.     the tradename "The Federal Club," and all of Sellers' other Intellectual Property, to the extent assignable, including without limitation any computer reservation and other software programs used in the operation and maintenance of the golf course and the pool, all Intellectual Property associated with the Mountain Run development and The Federal Club including, without limitation, any right to market The Federal Club as being designed by Arnold Palmer, all goodwill associated therewith, licenses and sublicenses granted and obtained with respect thereto, and rights thereunder, remedies against infringements thereof, and rights to protection of interests therein under the laws of all jurisdictions;

ix.     goodwill and going concern value of the Sellers and the Business; and

x.     inventory on hand as of Closing.

provided, however, that the Acquired Assets shall not include the following, which shall constitute the "***Excluded Assets***":

A.     any of the rights of Sellers under this Agreement, including the consideration received hereunder;

B.     any duplicate copies of the books and records transferred to Buyer, including but not limited to the corporate charter, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, blank stock certificates, and other documents relating to the organization, maintenance, and existence of MR as a limited liability company or MR Golf as a corporation;

C.     any rights and claims (including refunds, credits and claims thereto) of Sellers with respect to Taxes of the Business attributable to the period prior to and including the Closing Date;

D.     any and all labor contracts or any Employee Benefit Plan;

E.     any Contracts not specifically identified as "to be assumed";

F.     Lot 40;

G.     five computers, a file server, and all computer peripherals used by MR and MR Golf for bookkeeping and accounting;

3

H.     all notes receivable relating to prior sales of real estate, whether or not secured by a Deed of Trust;

I.     all personal property that belongs to individual owners and members of MR and MR Golf;

J.     all notes receivable relating to the Business coming due prior to Closing, including, but not limited to, all billed and unbilled accounts receivable, membership deposits and initiation fees and any promissory notes or other instruments evidencing membership deposits and initiation fees not yet paid;

K.     any notes from the owners and members of MR, MR Golf, and MR Utilities to the Sellers and MR Utilities; and

L.     anything which is not specifically identified as an Acquired Asset.

(b)     Assumption of Liabilities.

i.     Notwithstanding anything to the contrary contained herein, Buyer shall not assume, nor does Buyer agree to pay, any debts, liabilities or obligations of Sellers whatsoever, including without limitation any federal, state or local taxes of Sellers on or measured by income, gross receipts or payroll, whether for the period ending as of the Closing Date or any other period or penalties or interest relating thereto, or any other taxes of Sellers of any kind or nature or penalties or interest relating thereto, except the performance obligations of Sellers under the Assumed Contracts (the "*Assumed Liabilities*").

ii.     Specifically, Buyer will not assume any obligations of MR Golf with respect to existing memberships in The Federal Club; however, if Buyer forms a new club with regard to the golf course and pool facilities, Buyer will admit anyone who is: (A) a member of The Federal Club as of Closing, (B) has previously paid in full their initiation fees to The Federal Club or is current in all initiation fee payments (or who is a exempt from payment of initiation fees pursuant to the Membership Plan of The Federal Club), and (C) who is current on payment of their Membership Dues, to any new club formed by Buyer for use of the golf course and/or the pool facilities without the payment of any additional initiation fees that would otherwise be payable to join the new club. Buyer shall not be restricted in requiring such persons to pay any and all dues and assessments as are otherwise payable by other members of the new club. Notwithstanding the foregoing, the membership contracts of the persons listed on **Schedule 2** shall be honored according to the terms of their contracts.

(c)     Purchase Price. The total purchase price for the Acquired Assets shall be Three Million Five Hundred Thousand and 00/100 Dollars ($3,500,000.00), payable by Buyer as follows:

(i)     Within three (3) days of the Effective Date, Buyer shall deliver to Essex Bank (the "Escrow Agent"), 4235 Innslake Drive, Suite 200, Glen Allen Virginia 23060, Attention: Gilbert F. Kennedy an earnest money deposit (the "Deposit") in the amount of ten

percent of the purchase price by wire transfer of immediately available funds. The Escrow Agent shall hold the Deposit in an interest bearing account and make delivery of the Deposit to the party entitled thereto under the terms of this Agreement. MRAP, LLC shall not be required to make the Deposit.

(ii)     The balance of the Purchase Price for the Acquired Assets shall be paid to Sellers in immediately available funds at Closing in accordance with wire instructions to be provided by Sellers.

(e)     Nature of this Agreement.     The Parties have entered into this Agreement in anticipation of a Bankruptcy Court hearing and have not had sufficient time to complete all schedules and certain other information to be incorporated in and made a part of this Agreement. Upon approval of this Agreement by the Bankruptcy Court, the Parties will complete all schedules and other information required by this Agreement. All such schedules and information shall be acceptable to each of the Parties in its sole discretion.

**Section 3.     Representations and Warranties of Seller**.     Sellers, jointly and severally, hereby represent and warrant to Buyer that the statements contained in this Section 3 are correct and complete as of the Effective Date of this Agreement and will be materially correct and complete as of the Closing Date. Any reference in this Section 3 to "Sellers" shall be deemed to be a reference to either or both of the Sellers.

(a)     Organization, Good Standing and Qualification.     MR is a limited liability company duly organized and validly existing under the laws of the Commonwealth of Virginia, and MR Golf is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Virginia, each with full legal power and authority to execute and deliver this Agreement and each other Transaction Document to which it is a party and to consummate the transactions contemplated hereby and thereby, and to own its respective assets and conduct its respective businesses as owned and conducted on the date hereof.

(b)     Authorization of Agreements.     Subject to the approval of the Bankruptcy Court, the execution, delivery and performance of this Agreement and each other Transaction Document to which a Seller is a party and the consummation of the transactions contemplated hereby and thereby by the Sellers have been duly and validly authorized by the managers, members, board of directors or shareholders of Sellers, as the case may be.     No further authorization is required on the part of the Sellers to consummate the transactions contemplated hereby or thereby, except for appropriate Bankruptcy Court approval.

(c)     Valid and Binding Agreements.     Subject to the approval of the Bankruptcy Court, this Agreement and each of the Transaction Documents to which a Seller is a party, constitutes the legal, valid and binding obligation of the Sellers, enforceable against the Sellers in accordance with their respective terms, except to the extent limited by bankruptcy, insolvency, reorganization and other laws affecting creditors' rights generally, and except that the remedy of specific performance or similar equitable relief is available only at the discretion of the court before which enforcement is sought.

5

(d)     Real Property.

        i.      There is no pending or, to the Knowledge of the Sellers, threatened condemnation, eminent domain or similar proceeding or special assessment affecting any of the Real Property, nor have the Sellers received notification that any such proceeding or assessment is contemplated.

        ii.     The Real Property shall be generally in the same physical condition at Closing as of the date hereof, reasonable wear and tear and insured casualty excepted, and no personal property shall have been removed except as permitted under the terms of this Agreement or in the ordinary course of business.

(e)     No Brokers or Finders.  Sellers have not employed any investment banker, broker or finder or incurred any liability for any investment banking fees, brokerage fees, commissions or finders' fees in connection with the transaction contemplated by this Agreement.  Sellers agree to indemnify and hold Buyer harmless from all liability, expense, loss, cost or damage, including reasonable attorneys' fees that may arise by reason of any claim, demand or suit or any agent, broker or finder claiming through Seller arising out of facts constituting a breach of the foregoing representations or warranties.  The provisions of this section shall survive closing or any termination of this agreement.

(f)     Limitations Regarding Sellers' Representations and Warranties.     Buyer acknowledges and agrees that Sellers, except as set forth herein, has not made, does not make, and specifically negates and disclaims any representations, warranties, promises, covenants, agreements or guaranties of any kind or character whatsoever, whether expressed or implied, oral or written, past, present or future, of, as to, concerning, or with respect to the Property including, without limitation:

        i.      value, nature, quality, or condition of the Property, including without limitation the water and soil and geology;

        ii.     income to be derived from the Property;

        iii.    suitability of the Property for any and all activities and uses which Buyer may conduct thereon;

        iv.     compliance of or by the Property or its operation with any laws, rules, ordinances, or regulations of any applicable governmental authority or body;

        v.      habitability, merchantability, marketability, profitability, or fitness for particular purpose of the Property;

        vi.     manner or quality of the construction or of the materials incorporated into the Property;

        vii.    manner, quality, state of repair, or lack of repair of the Property; or

6

viii.    other matters with respect to the Property and specifically that Sellers have not made, do not make, and specifically disclaims any representation regarding compliance with any federal, state, or local environmental law, regulation, or ordinance regarding hazardous substances or waste including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") and Chapters 376 and 403, Florida Statutes (1993), both as amended or modified.

(g)    Except for the representations and warranties made by Sellers contained herein or in any of the Transaction Documents, Buyer further acknowledges and agrees that having been given the opportunity to inspect the Property, Buyer is relying solely on its own investigation of the Property and not on any information provided or to be provided by Sellers. Buyer further acknowledges and agrees that any information provided or to be provided with respect to the Property was obtained from a variety of sources and that Seller has not made any independent investigation or verification of such information and makes no representations as to the accuracy or completeness of any such information. Buyer agrees that Sellers are not, and shall not be, liable or bound in any manner by any verbal or written statements, representations, or information pertaining to the Property, or the operation thereof, furnished by any real estate broker, agent, employee, servant, or any other person. Buyer further acknowledges and agrees that to the maximum extent permitted by state, local, and federal law, the sale of the Property as provided for herein is made on a "AS IS" condition and basis with all faults. It is understood and agreed that the Purchase Price has been adjusted by prior negotiations to reflect that all of the Property is sold by Sellers and purchased by Buyer subject to the foregoing.

(h)    Without limiting the above, Buyer on behalf of itself and its successors and assigns waives its right to recover from, and forever releases and discharges, Sellers, Sellers' affiliates, partners, trustees, shareholders, directors, officers, employees, and agents of each of them, and their respective heirs, successors, personal representatives, and assigns, from any and all demands, claims, legal or administrative proceedings, losses, liabilities, damages, penalties, fines, liens, judgments, costs or expenses whatsoever including, without limitation, attorneys' fees and costs, whether direct or indirect, known or unknown, foreseen or unforeseen, that may arise on account of or in any way be connected with the Property, including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. Section 6901, et seq.), the Resources Conservation and Recovery Act of 1976 (42 U.S.C. Section 6901, et seq.), the Clean Water Act (33 U.S.C. Section 1251, et seq.), the Safe Drinking Water Act (14 U.S.C. Section 1401, et seq.), the Hazardous Materials Transportation Act (49 U.S.C. Section 1801, et seq.), the Toxic Substance Control Act (15 U.S.C. Section 2601, et seq.), all as amended or modified.

(i)    If Buyer obtains knowledge of any matters before the end of the Feasibility Period which render any of the Sellers' representations and warranties contained herein untrue or false, Buyer may either as its sole remedy (i) consummate the acquisition of the Property subject thereto (thereby waiving any claim therefore against Sellers) if Buyer determines to proceed with the purchase of the Property or (ii) Buyer may terminate this Agreement and neither party shall have any further obligations hereunder except those that expressly survive termination of this Agreement.

**Section 4.     Representations and Warranties of Buyer.**  Buyer represents and warrants to Sellers that the statements contained in this Section 4 are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date.

(a)     Organization of Buyer.  Buyer is a limited liability company duly organized and validly existing under the laws of the Commonwealth of Virginia.

(b)     Authorization of Transaction.  Buyer has full power and authority (including full entity power and authority) to execute and deliver this Agreement and to perform its obligations hereunder.     This Agreement constitutes the valid and legally binding obligation of Buyer, enforceable in accordance with its terms and conditions, except to the extent such enforceability is subject to the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or other law affecting or relating to creditors' rights generally and general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(c)     Noncontravention.  Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which Buyer is subject or any provision of its articles of incorporation or bylaws or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer is a party or by which it is bound or to which any of its assets is subject.     Buyer does not need to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or Governmental Entity in order for the Parties to consummate the transactions contemplated by this Agreement.

(d)     Brokers' Fees.  Buyers have not employed any investment banker, broker or finder, **[EXCEPT _____]** or incurred liability for any investment banking fees, brokerage fees, commissions or finders' fees in connection with the transaction contemplated by this Agreement.  Buyer agrees to indemnify and hold Seller harmless from all liability, expense, loss, cost or damage, including reasonable attorneys' fees, that may arise by reason of any claim, demand or suit by any agent, broker or finder claiming through Buyer arising out of facts constituting a breach of the foregoing representations or warranties.  The provisions of this Section shall survive Closing or any termination of this Agreement.

(e)     Litigation.  There is no pending or threatened action, suit, proceeding, hearing or investigation that could result in any material adverse change in Buyer's ability to perform its obligations under this Agreement.

**Section 5.     Pre-Closing Covenants.**  The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing Date.

(a)     General.  Each of the Parties will use its best efforts to take all action and to do all things necessary, proper, or advisable in order to consummate and make effective the

transactions contemplated by this Agreement (including satisfaction, but not waiver, of the closing conditions set forth in Section 7 below).

(b) Operation of Business. Sellers will not engage in any practice, take any action, or enter into any transaction outside the ordinary course of business prior to the Closing Date, without the prior approval of the Bankruptcy Court. Without limiting the generality of the foregoing, Sellers will not, prior to the Closing Date, without the prior written consent of Buyer which consent Buyer may withhold in its sole discretion, and the consent of the Bankruptcy Court:

i. declare, set aside, or pay any dividend or make any distribution of its tangible assets with respect to the capital stock (whether in cash or in kind) or membership interests, as applicable, or redeem, purchase, or otherwise acquire any of its capital stock or membership interests;

ii. sell, lease, transfer, or assign any of its real estate (except Lot 40) and will not sell, lease, transfer or assign any of its other assets, tangible or intangible, to any third party (including any intercompany transfer) other than for a fair consideration in the ordinary course of business;

iii. enter into any agreement, contract, lease, or license (or series of related agreements, contracts, leases, and licenses) either involving more than $5,000 or outside the ordinary course of business;

iv. make any loan to, or enter into any other transaction with, any of its directors, officers, and employees;

v. enter into any employment contract or collective bargaining agreement, written or oral, or modify the terms of any such existing contract or agreement;

vi. grant any increase in the compensation (including base salary and bonus) of any of its directors, officers, and employees other than the ordinary course of business;

vii. make any other change in employment terms for any of its directors, officers, and employees other than in the ordinary course of business;

viii. make or pledge to make any charitable or other capital contribution outside the ordinary course of business; or

ix. agree in writing or otherwise commit to do any of the foregoing.

(c) Preservation of Business. Sellers will continue to operate the golf course and pool facilities in substantially the same manner as it has been operating since filing the Bankruptcy Petition until Closing, to the extent that income from operation of the golf course and pool facilities are available to do so. Subject to the Order authorizing the Sellers to use cash collateral, dues from members and other fees and income from operation of the golf course and pool

9

facilities shall be used to pay operating costs until closing, and no maintenance or services will be cut or diminished except to the extent that funds are not available to continue such maintenance or services.

(d)  Notice of Developments. Each Party will give prompt written notice to the other Parties of any breach of any of its own representations and warranties in Section 3 and Section 4 above. No disclosure by any Party pursuant to this Section, however, shall be deemed to amend or supplement Sellers' Disclosure Schedule or to prevent or cure any misrepresentation, breach of warranty, or breach of covenant.

(e)  Seller's Employees.

i.  Sellers agree that, effective at the Closing Date, the Sellers will terminate the employment of all of its employees necessary to conduct the Business (and release such employees from any non-competition agreements that may exist between the Sellers and its employees). The Buyer shall retain the sole and absolute discretion to determine which of Seller's employees the Buyer will hire from and after Closing (and the terms and conditions of employment for any such employees that Buyer elects to hire). Nothing herein shall require the Sellers to terminate the employment of its employees necessary to conduct the affairs of MR or MR Golf after the Closing.

ii.  Sellers shall pay to or on behalf of all of its employees, as of the Closing Date, all wages, salary, and benefit plan contributions due to such employees on account of all periods through the Closing Date.

(f)  Bankruptcy Actions.

i.  As soon as practicable after the execution of this Agreement Sellers shall file and serve a motion and notice thereof as required by the Bankruptcy Code and Federal Rules of Bankruptcy Procedure seeking entry of a sale procedures order (the "Sale Procedures Order") and set such motion for hearing (the "*Sale Procedures Hearing*") in the Bankruptcy Court as soon as the parties may be heard.

ii.  The motion requesting approval of the Sale Procedures Order will also move the Bankruptcy Court to approve this Agreement and Sellers' required performance under this Agreement. Sellers shall use commercially reasonable efforts to obtain entry of the Sale Procedures Order at the Sale Procedures Hearing.

iii.  Sellers agree that they will promptly take such actions as are reasonably necessary in obtaining entry of the Sale Procedures Order and the Bidding Procedures, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by Sellers of their obligations under this Agreement and demonstrating that Buyer is a good faith buyer under Section 363(m) of the Bankruptcy Code.

iv.  The Sale Procedures Order shall contain provisions requiring an auction of the Sellers' assets in two or more lots, the Golf Course Assets and the Residential and

10

Development Assets, which may be sold individually or together. The Sellers may modify the quanta of land to be sold as part of the Residential and Development Assets, with appropriate modifications of minimum bids, until the Auction commences.

      v.     From the Effective Date until Closing, Sellers are permitted to initiate contact with, solicit, encourage submissions of any proposals, bids or offers, by any person in addition to Buyers, for the sale of all of the Assets in this agreement, or the Golf Course Assets or Residential and Development Assets (as those terms are defined in Sale Order) (the "Alternative Bids").

      vi.    Buyers' initial bid shall constitute a credit bid as defined in Section 363(k) of the Bankruptcy Code. As long as an Alternative Bid: (a) has a purchase price that exceeds the Purchase Price of this Agreement and (b) is in substantially the same form as this Agreement, the Buyers will not exercise their right to credit bid pursuant to Section 363(k) of the Bankruptcy Code in an amount higher than the Alternative Bid.

     (g)    Taxes.

      i.     On or prior to the Closing, Sellers shall pay all Real Estate Taxes which are due and owing with respect to the Acquired Assets and attributable to tax periods or portions thereof prior to the Closing.

     (h)    Risk of Loss. The risk of loss or damage to the Real Property by fire or other casualty prior to Closing shall be on Sellers. If such loss or damage materially and adversely affects Buyer's intended use and enjoyment of the Real Property as of Closing, Buyer shall be entitled to terminate this Agreement and the Parties shall have no further obligations or liabilities to one another hereunder. For the purposes of this paragraph, materiality constitutes any uncompensated loss in the excess of $50,000.

## Section 6.    Feasibility Period.

     (a)    Preparation for Inspection. Within seven (7) days following the Effective Date Sellers shall, to the extent in Sellers' possession, deliver to Buyer or make available at the Real Property copies of those items and materials described on **Appendix B** attached hereto and by this reference made a part hereof (the "Due Diligence Materials"). Buyer acknowledges that Sellers are providing the Due Diligence Materials as an accommodation to Buyer and Seller makes no representation or warranty of any kind with respect to the completeness or accuracy of the Due Diligence Materials.

     (b)    Duration. Buyer shall have the right, subject to the terms and conditions contained herein, for a period commencing on the Effective Date and ending on the date which is thirty (30) days after the Effective Date (the "Feasibility Period") to enter upon the Real Property to inspect and investigate the Acquired Assets to determine whether or not the same is satisfactory to Buyer in Buyer's sole discretion. Notwithstanding the foregoing, if Sellers fail to deliver or make available the Due Diligence Materials within seven (7) days following the effective date the Feasibility Period shall be extended by one (1) day for each day that Sellers fail

to deliver or make available any required Due Diligence Materials items in Sellers' possession to Buyer.

(c)     Entry and Inspection. Sellers shall make the Acquired Assets available for inspection by Buyer, Buyer's employees, agents and contractors, during normal business hours upon twenty-four (24) hours prior notice to Buyer. Buyer may, at its sole risk and expense, undertake a complete, non-intrusive, physical inspection of the Acquired Assets if Buyer deems such inspection appropriate. In addition, Buyer shall have the right to review any files maintained by Seller in connection with the operation or management of the Acquired Assets or the Business. Buyer shall not conduct or allow any physically intrusive testing of, on or under the Acquired Assets without first obtaining Sellers' written consent in each instance as to the timing and scope of the work to be performed. All such inspection, investigations and examinations shall be undertaken at Buyer's sole cost and expense. Buyer agrees that it will be and will cause any person inspecting the Acquired Assets hereunder to be covered by not less than a $1,000,000 policy of general liability insurance (with, in the case of Buyer's coverage, a contractual liability endorsement insuring its indemnity obligation under this Agreement), insuring all activity and conduct of such person while exercising such right of access and naming Sellers as an additional insured, issued by a licensed insurance company qualified to do business in the Commonwealth of Virginia and otherwise reasonably acceptable to Sellers. Buyer will coordinate all on-site inspections with Sellers so that Sellers shall have the option of having one of Sellers' representatives present at any and all such on-site inspections. After completing any such inspections, Buyer shall promptly restore and repair any damage caused by Buyer's inspections to substantially the same condition that existed immediately prior to such inspection, and Buyer hereby agrees to indemnify and hold Sellers harmless from any and all claims made or causes of action brought against Sellers or the Acquired Assets resulting from the activities of Buyer or any of Buyer's employees, contractors, consultants, agents, or servants in conducting any such inspections of the Acquired Assets. The provisions of this Section shall survive Closing or any termination of this Agreement.

(d)     Title and Survey.

i.     As soon as reasonably possible following the Effective Date, Buyer may order a title commitment, together with copies of all title documents listed as exceptions therein (the "Commitment") through a nationally recognized title company of the Seller's choice, agreeing to issue to Buyer an owner's title insurance policy in the total amount of the Purchase Price insuring fee simple marketable title to the Real Property, subject only to the requirements of, and matters shown on, the Commitment (the "Title Policy"). Within five (5) days after receipt of the Commitment and Survey (as defined below) by Buyer but in no event after the date which is twenty (20) days after the Effective Date, Buyer shall notify Seller in writing of any defects or objections to the title appearing in the Commitment or Survey (each a "Title Defect" and collectively, the "Title Defects"). Any failure by Buyer to provide such notice shall be deemed Purchaser's approval of the Commitment and the Survey. Within five (5) days after receipt of Buyer's notice of Title Defects, Seller shall provide written notice to Buyer of those Title Defects it elects to attempt to cure and Seller shall have until Closing to cure said Title Defects. Any failure of Seller to provide such notice shall be deemed Seller's election to not cure any such Title Defects. If Seller (a) elects or is deemed to have elected not to cure any or all

12

Title Defects or (b) fails to cure any Title Defects which Seller has agreed to attempt to cure, Purchaser may in its sole discretion and as its sole remedy on account of such failure either (y) terminate this Agreement or (z) waive such Title Defects and consummate the Closing. If Purchaser elects under clause (z) above in accordance with the foregoing, then any Title Defect previously objected to by Purchaser which Seller has not cured shall become a Permitted Exception.

    ii. Permitted Exceptions. It is understood and agreed that the Real Property is being sold by Seller to Purchaser free and clear of all liens, claims, and encumbrances, except the Permitted Exceptions, and it is further understood and agreed that the conveyance by Special Warranty Deed (the "Deed") to be delivered by Seller at Closing shall be subject only to the following (collectively, the "Permitted Exceptions"):

    A. laws, ordinances, and governmental regulations (including but not limited to building, zoning, land use and any subdivision ordinances and regulations) affecting the Real Property;

    B. all matters shown on the Commitment which are not objected to by Buyer or as to which Buyer waived its objection pursuant to subsection i. above;

    C. real estate taxes and assessments for the year of Closing and subsequent years which are not yet due and payable (subject to proration as set forth herein); and

    D. matters which would be disclosed by an accurate survey or inspection of the Real Property.

    iii. Survey. Buyer may cause a new survey of the Premises to be prepared at its own expense by a registered land surveyor duly licensed in the Commonwealth of Virginia (the "Survey") on or before the date which is twenty (20) days after the Effective Date. The Survey shall be prepared in such a manner so as to allow the Title Company to delete the standard survey exception from the Commitment and in its place insert the specific survey exceptions based on the Survey.

    (e) Meg's Lane Lots. On or before the expiration of the Feasibility Period, Sellers shall have delivered evidence satisfactory to Buyer that, with regard to the Meg's Lane Lots, as more particularly described in an agreement dated January 3, 2001, between Thomas F. Pollard, Jr., and Elizabeth Hope Gilman and Mary Elizabeth Gilman King (the "Meg's Lane Agreement"): (i) evidence satisfactory to Buyer in Buyer's sole and absolute discretion that the Meg's Lane Agreement has been terminated or is no longer effective against the Meg's Lane Lots, or (ii) a proforma owner's title insurance policy issued by a title insurance company acceptable to Buyer with no exceptions to title other than the Permitted Exceptions, and without exception for the Meg's Lane Agreement, together with assurances from such title insurance company, acceptable to Buyer in Buyer's sole and absolute discretion, that the title insurance company irrevocably agrees to provide owner's and lender's title insurance policies for any of the Meg's Lane Lots to builders who purchase Meg's Lane Lots and homeowners who purchase any homes constructed on the Meg's Lane Lots without exception for the Meg's Lane Agreement. The intent of the foregoing sentence is that the title insurance company would

provide full insurability coverage and marketability coverage, without exception for the Meg's Lane Agreement, to Buyer and any future person or entity holding any interest in a Meg's Lane Lots. In the event the Sellers cannot satisfy the Buyer on or before the expiration of the Feasibility Period that the Sellers will be able to convey title to the Real Property at Closing free of the encumbrance of the Meg's Lane Agreement, Buyer shall have the right to either (y) terminate this Agreement as to the Meg's Lane Lots and proceed to Closing on the balance of the Acquired Assets with a reduction in the purchase price in the amount of Five Hundred Thousand and 00/100 Dollars ($500,000.00) or (z) waive its objection to the Meg's Lane Agreement and consummate the Closing of all of the Acquired Assets subject to the rights of the holders of the rights under the Meg's Lane Agreement. Buyer acknowledges that Sellers make no representations or warranties about their ability to convey title to the Real Property free and clear of the encumbrance of the Meg's Lane Agreement at Closing. To the extent that the Meg's Lane Lots are not currently encumbered by the declaration of protective covenants that encumber the portions of Mountain Run that are already developed, Sellers shall submit the Meg's Lane Lots as additional property encumbered by the covenants. Conversely, Buyer shall grant rights for residential homeowners at Meg's Lane Lots to connect to Utilities at the same conditions and rates as provided to Mountain Run homeowners and shall provide any easement, access, or other rights necessary to permit the development and use of the Meg's Lane Lots.

(f)     Mountain Run Utilities. On or before the expiration of the Feasibility Period, Buyer shall have entered into an Asset or Stock Purchase Agreement, by and between Buyer, MR Utilities or the equity owners of MR Utilities, as appropriate, (the "MR Utilities Purchase Agreement") on terms and conditions satisfactory to Buyer in its sole and absolute discretion, and closing of that Agreement must be concurrent with the Closing Date herein. The consideration for Mountain Run Utilities must be approved by the Bank.

(g)     Identification of Assumed Contracts:     On or before the expiration of the Feasibility Period, the Buyer shall identify all unexpired leases and/or contracts that it wishes to assume and pay the cure costs for such leases and contracts.

(h)     Termination. Buyer shall have the right at any time on or before the expiration of the Feasibility Period to notify Sellers in writing that it has elected to terminate this Agreement, if Purchaser in its sole discretion for any reason or no reason determines that the Acquired Assets are not satisfactory to Buyer.

(i)     Confidentiality and Availability of Due Diligence Materials. Buyer agrees to hold and keep confidential all materials provided to it by the Sellers and all due diligence materials it prepares or receives during the Feasibility Period. Buyer acknowledges that this purchase will subject to an auction of the Acquired Assets and Bankruptcy Court Approval.

**Section 7.     Conditions to Obligation to Close.**

(a)     Conditions to Obligation of Buyer. The obligation of Buyer to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

i. the representations and warranties set forth in Section 3 above shall be true and correct in all material respects at and as of the Closing Date, except that representations and warranties qualified by materiality shall be true and correct in all respects at and as of the Closing Date;

ii. Sellers shall have performed and complied with all of their covenants hereunder in all material respects through the Closing, except that covenants qualified by materiality shall have been performed and complied with in all respects through the Closing;

iii. no action, suit, or proceeding shall be pending before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction wherein an unfavorable injunction, judgment, order, decree, ruling, or charge would (A) prevent consummation of any of the transactions contemplated by this Agreement, (B) cause any of the transactions contemplated by this Agreement to be rescinded following consummation, or (C) affect adversely the right of Buyer to own any of the Acquired Assets, and to operate the former Business of Sellers (and no such injunction, judgment, order, decree, ruling, or charge shall be in effect);

iv. sellers shall have delivered to Buyer a certificate to the effect that each of the conditions specified in Sections 7(a)(i) through (iii) are satisfied in all respects;

v. the Sale Order shall have been entered on the docket by the Clerk of the Bankruptcy Court, and will provide that the stay prescribed by Federal Rule of Bankruptcy Procedures 6004(h) is waived, and that the Sale Order is effective immediately upon entry by the Bankruptcy Court;

vi. there shall not have occurred a Material Adverse Change since the Effective Date;

vii. the Sellers shall have obtained all of the third party consents that are otherwise necessary in order for Sellers to assign the Assumed Contracts; and

viii. all actions to be taken by Sellers in connection with consummation of each of the transactions contemplated hereby and all certificates, instruments, and other documents required to effect the transactions contemplated hereby will be reasonably satisfactory in form and substance to Buyer. Buyer may waive any condition specified in this Section 7(a) if it executes a writing so stating at or prior to the Closing.

(b) **Conditions to Obligation of Sellers.** The obligation of Sellers to consummate the transactions to be performed by them in connection with the Closing is subject to satisfaction of the following conditions:

i. the representations and warranties set forth in Section 4 above shall be true and correct in all material respects at and as of the Closing Date, except that representations and warranties qualified by materiality shall be true and correct in all respects at and as of the Closing Date;

ii.    buyer shall have performed and complied with all of its covenants hereunder in all material respects through the Closing, except that covenants qualified by materiality shall have been performed and complied with in all respects through the Closing;

iii.    no action, suit, or proceeding shall be pending before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction wherein an unfavorable injunction, judgment, order, decree, ruling, or charge would (A) prevent consummation of any of the transact ions contemplated by this Agreement or (B) cause any of the transactions contemplated by this Agreement to be rescinded following consummation (and no such injunction, judgment, order, decree, ruling, or charge shall be in effect);

iv.    Buyer shall have delivered to Sellers a certificate to the effect that each of the conditions specified above in Section 7(b)(i) through (iii) is satisfied in all respects; and

v.    all actions to be taken by Buyer in connection with consummation of the transactions contemplated hereby and all certificates, instruments, and other documents required to effect the transactions contemplated hereby will be satisfactory in form and substance to Sellers. Sellers may waive any condition specified in this Section 7(b) if they execute a writing so stating at or prior to the Closing.

## Section 8.    Termination.

(a)    Termination of Agreement.    This Agreement may be terminated as provided below:

i.    Buyer and Sellers may terminate this Agreement by mutual written consent at any time prior to the Closing;

ii.    following the Expiration of the Feasibility Period, Buyer may terminate this Agreement by giving written notice to Sellers at any time prior to the Closing (A) if either Seller has breached any representation, warranty, or covenant contained in this Agreement in any material respect, or (B) if the Closing shall not have occurred on or before June 30, 2010 by reason of the failure of any condition precedent under Section 7(a) hereof (unless the failure results primarily from a breach by Buyer of any representation, warranty, or covenant in any material respect contained in this Agreement);

iii.    Sellers may terminate this Agreement by giving written notice to Buyer at any time prior to the Closing (A) if Buyer has breached any representation, warranty, or covenant contained in this Agreement in any material respect, or (B) if the Closing shall not have occurred on or before June 30, 2010, by reason of the failure of any condition precedent under Section 7(b) hereof (unless the failure results primarily from a breach by Sellers of any representation, warranty, or covenant in any material respect contained in this Agreement);

iv.    by Buyer or Sellers if (A) any Seller consummates any purchase and sale agreement relating to the Business or the Acquired Assets with any Person other than Buyer or (B) the Bankruptcy Court enters an order approving any purchase and sale agreement relating to

the Business or the Acquired Assets (other than the sale of the Business and the Acquired Assets to Buyer);

      v.    by Buyer in its sole discretion at any time during the Feasibility Period.

**Section 9.**     **The Closing.**

    (a)     <u>Time and Place of Closing</u>. The closing of the transactions contemplated by this Agreement (the "*Closing*") shall take place at the offices of LeClairRyan, commencing at 10:00 a.m. local time on the second Business Day after the date on which all conditions precedent to the closing obligations of the parties shall have been satisfied or waived, or on such other date and at such other place and time as the Parties may mutually determine (the "*Closing Date*"); <u>provided, however</u>, that the Closing Date shall occur no later than July 15, 2010.

    (b)     <u>Deliveries and Proceedings at the Closing</u>. Subject to the terms and conditions of this Agreement:

      i.    <u>Deliveries by Sellers to Buyer</u>. At the Closing, Sellers shall deliver to Buyer:

      A.    The Deed executed by MR conveying the Real Property to Buyer in the form attached hereto as **EXHIBIT C** free and clear of all encumbrances other than the Permitted Exceptions;

      B.    A Bill of Sale, without warranty of title, executed by MR conveying the tangible Personal Property to Buyer in the form attached hereto as **EXHIBIT D**;

      C.    An Assignment of Permits and Intangibles executed by MR assigning to Buyer and transferrable permits and intangible Personal Property constituting part of the Acquired Assets in the form attached hereto as **EXHIBIT E**;

      ii.    <u>Deliveries By Buyer to Sellers</u>. At Closing, Buyer shall deliver to Sellers:

      A.    Executed and acknowledged counterparts of the Assignment of Permits and Intangibles in the form attached hereto as **EXHIBIT F**;

      B.    wire transfer or certified check of immediately available funds in an amount equal to the Adjusted Base Purchase Price;

      C.    the certificates required to be delivered by Buyer pursuant to Section 7(b)(iv); and

      D.    all such other documents and instruments of assumption as shall be reasonably necessary for Buyer to assume the Assumed Liabilities in accordance herewith.

(d)     Closing Costs; Prorations. Sellers shall pay the cost of preparing the Deed and the grantor's tax thereon and all other documents to be delivered by Sellers at Closing. Buyer shall pay all costs, title insurance premiums and expenses incurred in connection with examination of title to the Real Property, the grantee's tax on the Deed, the Clerk's fees for recording the Deed and the cost of preparation of the Survey. Real estate taxes, personal property taxes, owner's association dues and membership dues and assessments shall be prorated between Sellers and Buyer as of the date of the Closing, according to the number of days of the year which the Acquired Assets are owned or to be owned by each Party. Except as otherwise provided herein, each Party shall pay its own legal, accounting and other expenses incurred in connection with this Agreement and Closing hereunder.

## Section 10.     Post-Closing Covenants.

(a)     Certain Consents. If a consent of a third party which is required in order to assign any Acquired Asset (or claim, right or benefit arising thereunder or resulting therefrom) is not obtained prior to the Closing Date, or if an attempted assignment would be ineffective or would adversely affect the ability of any Seller to convey its interest in question to Buyer, Sellers will cooperate with Buyer and use commercially reasonable efforts in any lawful arrangement to provide that Buyer shall receive the interests of any Seller in the benefits of such Acquired Asset. Each Seller agrees to continue to use commercially reasonable efforts to obtain all such consents as have not been obtained prior to such date.

(b)     Accounts Receivable; Collections. After the Closing, Sellers shall permit, and hereby authorize, Buyer to collect, in the name of Sellers, all accounts receivable constituting part of the Acquired Assets and to endorse with the name of any applicable Seller for deposit in any Buyer account any checks or drafts received in payment thereof. Sellers shall promptly deliver to Buyer any cash, checks or other property that they may receive after the Closing in respect of any accounts receivable or other asset constituting part of the Acquired Assets. Buyer shall promptly deliver to Sellers any amount, whether or not termed "accounts receivable" that are paid to the Buyer that remain property of the Sellers.

(c)     Further Assurances After Closing, each Party, without further consideration, shall promptly take such actions and shall promptly execute and deliver such documents and instruments as may be reasonably requested by the other Party (or by the other Party's officers, employees, agents, or representatives) to effectuate, evidence, authorize, or approve the transactions contemplated in this Agreement.

## Section 11.     Miscellaneous Provisions.

(a)     Entire Agreement. This Agreement (including the **Appendices**, **Schedules** and other documents referred to or incorporated by reference herein or attached hereto) constitutes the entire agreement between the Parties and supersedes any prior understandings, agreements, or representations by or between the Parties, written or oral, to the extent they related in any way to the subject matter hereof. The **Appendices** and Sellers' Disclosure Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

(b)     Succession and Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Party; provided, however, that Buyer may (i) assign any or all of its rights and interests hereunder to one or more of its Affiliates and (ii) designate one or more of its Affiliates to perform its obligations hereunder (in any or all of which cases Buyer nonetheless shall remain responsible for the performance of all of its obligations hereunder).

(c)     Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

(d)     Headings. The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

(e)     Notices. All notices, requests, demands, claims, and other communications hereunder will be in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given upon receipt if it is sent by United States mail, facsimile, or reputable express courier, and addressed or otherwise sent to the intended recipient as set forth below:

If to Sellers (before Closing):

Mountain Run, LLC and Mountain Run Golf, Inc.
c/o Richard Laibstain
P.O. Box 1722
Glen Allen, Virginia 23060

If to Sellers (after Closing):
c/o Richard Laibstain
P.O. Box 1722
Glen Allen, Virginia 23060

With a copy to:

Douglas A. Scott, PLC
1805 Monument Avenue, Suite 311
Richmond, VA 23220

If to Buyer:

MRAP, LLC
4235 Innslake Drive, Suite 200
Glen Allen, Virginia 23060

With a copy to:
LeClairRyan, A Professional Corporation
Attn: Vernon E. Inge, Jr.
Post Office Box 2499
Richmond, Virginia 23218

To Bank:

Essex Bank
c/o Gilbert F. Kennedy
2120 Baldwin Avenue
Crofton, Maryland 21114

With a copy to:
LeClairRyan, A Professional Corporation
Attn: Vernon E. Inge, Jr.
Post Office Box 2499
Richmond, Virginia 23218

Any Party may send any notice, request, demand, claim, or other communication hereunder to the intended recipient at the address set forth above using any other means (including personal delivery, messenger service, or ordinary mail), but no such notice, request, demand, claim, or other communication shall be deemed to have been duly given unless and until it actually is received by the intended recipient. Any party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

(f)     Governing Law; Venue. This Agreement shall be governed by and construed in accordance with the domestic laws of the Commonwealth of Virginia and the United States Bankruptcy Code without giving effect to any choice or conflict of law provision or rule either of the Commonwealth of Virginia or any other jurisdiction. The exclusive venue for any dispute arising between the Parties under this Agreement shall be irrevocably the United States Bankruptcy Court, Eastern District of Virginia, Richmond Division.

(g)     Amendments and Waivers. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each of the Parties hereto. No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

(h)     Severability. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

(i)     Expenses.  Except as otherwise set forth herein, each of the Parties will bear its own costs and expenses incurred in connection with this Agreement, the Transaction Documents and each of the transactions contemplated hereby and thereby.  If an action is brought for breach of this agreement, the prevailing party shall be entitled to reasonable attorneys' fees.

(j)     Construction.

i.     Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  Words in the singular shall be held to include the plural and vice versa, and words of one gender shall be held to include the other genders as the context requires.  The terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole (including all of the **Schedules** and **Appendices** hereto) and not to any particular provision of this Agreement.  Article, Section, paragraph, **Appendices** and **Schedule** references are to the Articles, Sections, paragraphs, **Appendices** and **Schedules** to this Agreement unless otherwise specified.  The word "including" and words of similar import when used in this Agreement shall mean "including, without limitation," unless otherwise specified.  The word "or" shall not be exclusive, and references to a Person are also references to its permitted successors and assigns.

ii.     Nothing in Sellers' Disclosure Schedules shall be deemed adequate to disclose an exception to a representation or warranty made herein unless Sellers' Disclosure Schedules identifies the exception with reasonable particularity and describes the relevant facts in reasonable detail.  Without limiting the generality of the foregoing, the mere listing (or inclusion of) a copy of a document or other item shall not be deemed adequate to disclose an exception to a representation or warranty made herein (unless the representation or warranty has to do with the existence of the document or other item itself).  The Parties intend that each representation, warranty, and covenant contained herein shall have independent significance.  If any Party has breached any representation, warranty, or covenant contained herein in any respect, the fact that there exists another representation, warranty, or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty or covenant.

iii.     The Parties have participated jointly in the negotiation and drafting of this Agreement and this Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting or causing any instrument to be drafted.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement through their duly authorized representatives as of the date first above written.

WITNESS/ATTEST:

**SELLERS:**

**MOUNTAIN RUN, LLC**

By: _____RICHARD LAIbstAIN_____ (Seal)
Name: _RICHARD LAIbstAIN_
Its: _MANAGING MEMBER_
　　　 by permission

**MOUNTAIN RUN GOLF, INC.**

By: _____RICHARD LAIbstAIN_____ (Seal)
Name: _RICHARD LAIbstAIN_
Its: _PRESIDENT_
　　　 by permission

**BUYER:**

**MRAP, LLC.**

By: _____Gilbert F. Kennedy III_____ (Seal)
Name: Gilbert F. Kennedy, III
Its: Authorized Agent
　　　 by permission

Agreed and Acknowledged for purposes of Section 2(f) hereof:

**BANK:**

**ESSEX BANK**

By: _____Gilbert F. Kennedy III_____ (Seal)
Name: Gilbert F. Kennedy, III
Its: Senior Vice President
　　　 by permission

## EXHIBIT A

### DESCRIPTION OF REAL ESTATE

**EXHIBIT B**

**SALE ORDER**

# **APPENDICES**

*Appendix A:* Definitions
*Appendix B:* Due Diligence Materials

## APPENDIX A

### CERTAIN DEFINITIONS

As used in this Agreement, the following terms shall have the respective meanings ascribed to them in this **Appendix A**.

"*Acquired Assets*" has the meaning specified in <u>Section 2(a)</u>.

"*Agreement*" has the meaning specified in the preface.

"*Affiliate*" of any Person means any Person, directly or indirectly controlling, controlled by or under common control with such Person. A Person shall be deemed to have control when such Person possesses the power, directly or indirectly, or has the power to direct or to cause the direction of, the management and policies of a Person through the ownership of voting securities, by contract or otherwise.

"*Assumed Contracts*" has the meaning set forth in the definitions of "Acquired Assets."

"*Assumed Liabilities*" has the meaning set forth in <u>Section 2(b)</u> hereof.

"*Auction*" means the auction conducted by Sellers pursuant to the Bidding Procedures Order for substantially all of the Acquired Assets in the event a Qualified Bid is timely received prior to the Bid Deadline (as defined in the Bidding Procedures Order).

"*Bankruptcy Code*" means the United States Bankruptcy Code, Title 11 of the United States Code.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division.

"*Base Purchase Price*" has the meaning specified in <u>Section 2(c)(i)(B)</u>.

"*Bid*" means any quotation, bid or proposal made by Sellers that if accepted or awarded would lead to a contract with any Person for the provision of services by Seller.

"*Business*" has the meaning specified in the recitals hereto.

"*Business Day*" means Monday through Friday, except for a federal holiday that falls on any of those days.

"*Buyer*" has the meaning specified in the preface.

"*Cash*" means cash and cash equivalents (including marketable securities and short term investments) calculated in accordance with GAAP applied on a basis consistent with the preparation of the Financial Statements.

"*Closing*" has the meaning specified in Section 9(a).

"*Closing Date*" has the meaning specified in Section 9(a).

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Commencement Date*" means the date on which Sellers have made all filings necessary to commence the Chapter 11 Cases in the Bankruptcy Court.

"*Due Diligence Materials*" shall mean each of the certificates, instruments, books, records and other documents listed on **Appendix B** hereto.

"*Employee Benefit Plan*" shall mean any (a) nonqualified deferred compensation or retirement plan or arrangement which is an Employee Pension Benefit Plan, (b) qualified defined contribution retirement plan or arrangement which is an Employee Pension Benefit Plan, (c) qualified defined benefit retirement plan or arrangement which is an Employee Pension Benefit Plan (including any Multi-Employer Plan), (d) Employee Welfare Benefit Plan, or (e) any bonus, incentive, severance, stock option, stock purchase, short-term disability plan or other material fringe benefit plan, program or arrangement, including policies concerning holidays, vacations and salary continuation during short absences for illness or otherwise.

"*Employee Pension Benefit Plan*" shall have the meaning set forth in ERISA Sec. 3(2).

"*Employee Welfare Benefit Plan*" shall have the meaning set forth in ERISA Sec. 3(l).

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*Excluded Assets*" has the meaning specified in the definition of "Acquired Assets."

"*Feasibility Period*" means the thirty (30) day period after the Effective Date, in which the Buyer may enter upon the Real Property to inspect and investigate the Acquired Assets to determine whether or not the same is satisfactory to Buyer in Buyer's sole discretion. If Sellers fail to deliver or make available the Due Diligence Materials within seven (7) days following the Effective Date, the Feasibility Period shall be extended by one (1) day for each day that Sellers fail to deliver or make available any required Due Diligence Materials items in Sellers' possession to Buyer.

"*Final Order*" means an Order as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"*Financial Statements*" has the meaning specified in Section 3(f)(i).

"*GAAP*" means United States generally accepted accounting principles as in effect from time to time.

"*Governmental Entity*" means any government or any agency, bureau, board, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"*Intellectual Property*" means (a) all trade secrets and confidential business information (including customer and supplier lists, ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, pricing and cost information, and business and marketing plans and proposals), (b) all trademarks, service marks, trade dress, logos, trade names, and corporate names, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (c) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof, (d) all copyrightable works, all copyrights, and all applications, registrations, and renewals in connection therewith, (e) all mask works and all applications, registrations, and renewals in connection therewith, (f) all computer software (including data and related documentation), (g) all other proprietary rights, and (h) all copies and tangible embodiments thereof (in whatever form or medium).

"*Inventory*" shall mean all supplies, products, and materials on hand and used in the Business.

"Knowledge." As used in this Agreement, or in any other agreement, document, certificate, or instrument delivered by Seller to Buyer, the phrase "to Seller's actual Knowledge," "to the best of Seller's Knowledge," or any similar phrase shall mean the actual, not constructive or imputed, knowledge of MR or MR Golf without any obligation on any of their parts to make any independent investigation of the matters being represented and warranted, or to make any inquiry of any other persons, or to search or examine any files, records, books, correspondence, and the like.

"*Liability*" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability for Taxes.

"*Lot 40*" means that certain lot known as "The Pointe" in Mountain Run.

"*Material Adverse Change*" means any material and adverse effect on the assets, liabilities, financial condition, business, or operations of the Sellers, taken as a whole.

"*Meg's Lane Lots*" has the meaning specified in Section 2(a)(i).

"*Mountain Run*" means a 600 acre golf course, pool facilities and residential community located off of Route 33 and Farrington Road in western Hanover County, Virginia, being developed by Sellers.

*"MR Utilities"* shall mean Mountain Run Utilities, Inc.

*"MR Utilities Purchase Price"* shall mean the amount paid by Buyer to Sellers for [all of the issued and outstanding stock] [substantially all of the assets] of Mountain Run Utilities, Inc. pursuant to that certain MR Utilities [Stock][Asset] Purchase Agreement of even date herewith.

*"Multi-Employer Plan"* has the meaning set forth in ERISA Sec. 3(37).

*"Non-Assumed Liabilities"* has the meaning set forth within the definition of Assumed Liabilities.

*"Order"* means any award, decision, decree, order, injunction, ruling, judgment, or consent of or entered, issued, made or rendered by any Governmental Entity.

*"Party"* has the meaning set forth in the preface.

*"Permits"* means all franchises, approvals, permits, licenses, orders, registrations, certificates, variances, exemptions, and similar rights obtained from governments and governmental agencies.

*"Permitted Exceptions"* has the meaning set forth in Section 6(d)(ii).

*"Person"* means an individual, a partnership, a corporation, an association, a joint stock company, a limited liability company or partnership, a trust, a joint venture, an unincorporated organization, or a Governmental Entity (or any department, agency, or political subdivision thereof).

*"Purchase Price"* has the meaning set forth in Section 2(c)(i).

*"Rule"* means any constitution or statute or law or any judgment, decree, injunction, order, ruling, ordinance or final regulation or rule of any Governmental Entity, including, without limitation, those relating to disclosure, usury, equal credit opportunity, equal employment, environment, employee safety and health, Government Bid and Government Contract, fair credit reporting and anti-competitive activities.

*"Sale Order"* means the Final Order of the Bankruptcy Court, in the form of Exhibit B attached hereto, to be entered by the Bankruptcy Court pursuant to Sections 363, 365 and 1146(c) of the Bankruptcy Code.

*"Security Interest"* means any lien, encumbrance, mortgage, pledge, charge, or other security interest.

*"Sellers"* has the meaning set forth in the preface.

*"Tax"* means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code Sec. 59A), customs duties, capital stock, franchise, profits,

withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including and interest, penalty, or addition thereto, whether disputed or not.

"*Tax Return*" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any amendments thereto.

"*Transaction Documents*" means any assignment and assumption agreement, bill of sale, promissory note, employment contract and any other documents that will be executed by Buyer and/or Seller, or one of their agents in connection with the transactions contemplated by this Agreement.

## APPENDIX B

## DUE DILIGENCE MATERIALS

The Due Diligence Materials shall include all of the following, to the extent that they relate to the Real Property and/or any other assets of the Sellers.

1. All plats, surveys, site plans, subdivision plats and master plans.

2. All owner's title insurance commitments and policies, and copies of all exceptions to title shown therein.

3. The ground lease between MR, as landlord, and MR Golf, as tenant.

4. All other leases, licenses or other occupancy agreements of any kind.

5. Copies of all governmental permits relating to the development of the MR Property, including, without limitation, zoning and subdivision approvals, proffered conditions, land disturbance permits, building permits and occupancy permits.

6. All governmental permits relating to the operation of the MR Golf Property, including, without limitation, all health permits, pool permits, restaurant permits, business licenses and ABC licenses.

7. All contracts and agreements which have not been (i) fully performed by all parties, or (ii) rejected by the Court, including, without limitation, any construction contracts, service contracts, professional services contracts with architects, engineers and similar providers, and employment contracts.

8. All documents evidencing or pertaining to any intellectual property owned by MR and/or MR Golf, including, without limitation, any documentation pertaining to the contract with the Arnold Palmer Design Company and any marketing rights associated with such contract, and any trademark registrations and/or licenses to use the name "Mountain Run" and/or "The Federal Club".

9. Copies of all documents pertaining to the organization, operation and management of the Mountain Run Owners Association, to the extent in the possession or control of MR or MR Golf.

10. Copies of all membership documents pertaining to The Federal Club, including all registers, accounts, promissory notes, the membership plan with all amendments and modifications, and the rules and regulations, with all amendments and modifications.

11. Copies of all operating statements, financial statements, and capital and operating budgets pertaining to the MR Property and the MR Golf Property.

12. Copies of all insurance policies issued to MR and/or MR Golf.

13. An inventory of all personal property owned or leased by MR and/or MR Golf.

14. Copies of all plans, specifications, construction drawings and related materials for the development of any of the MR Property.

15. Copies of all organizational documents and foreign qualification materials for each of the Sellers.

16. Copies of all environmental reports received by the Sellers or any related party concerning the Real Property.